UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAROLD S. VARNER,

               Petitioner,

                                                CASE NO. 2:08-CV-11162

v.                                    JUDGE LAWRENCE P. ZATKOFF
                                            MAGISTRATE JUDGE PAUL J. KOMIVES

HUGH WOLFENBARGER,

               Respondent.[1]

                                         /

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     C.    *Exhaustion/Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     E.    *Denial of Continuance (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     F.    *Other Acts Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     G.    *Prosecutorial Misconduct (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                a. Denigrating Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                b. Vouching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                c. Late Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     H.    *Suppression of Exculpatory Evidence (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     I.    *Ineffective Assistance of Counsel (Claims V-VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

           1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

           2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                a. Failure to Investigate/Obtain Transcripts . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                b. Failure to Call Burnside/Alibi Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

                c. Handling of Higginbotham Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

---

[1]By Order entered this date, Hugh Wolfenbarger has been substituted in place of Kenneth McKee as the proper respondent in this action.

|  |  | d. Failure to Object to Prosecutorial Misconduct | 36 |
|  | J. | *Cumulative Error (Claim VIII)* | 36 |
|  | K. | *Recommendation Regarding Certificate of Appealability* | 37 |
|  |  | 1. *Legal Standard* | 37 |
|  |  | 2. *Analysis* | 38 |
|  | L. | *Conclusion* | 39 |
| III. | | NOTICE TO PARTIES REGARDING OBJECTIONS | 39 |

\* \* \* \* \*

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner Harold S. Varner is a state prisoner, currently confined at the Macomb Correctional Facility in New Haven, Michigan.

    2.    On July 30, 2002, petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Wayne County Circuit Court. On August 13, 2002, he was sentenced to a term of 20-35 years' imprisonment.[2]

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED MR. VARNER DUE PROCESS AND A FAIR TRIAL IN FAILING TO SEVER THE CASES OF MR. VARNER AND HIS CO-DEFENDANT JOHN POOLE WHERE BOTH MEN WERE TRIED BY THE SAME JURY.

    II.    THE TRIAL COURT ERRED WHEN UNDER MRE 404(B) IT ALLOWED

---

[2]Prior to trial, the trial court dismissed the charges against petitioner based on the prosecution's failure to timely file a witness list. On the prosecutor's appeal, the Michigan Court of Appeals reversed the trial court's decision and reinstated the charges against petitioner and his codefendant. *See People v. Adams*, No. 245550, 2004 WL 1635843 (Mich. Ct. App. July 22, 2004).

EVIDENCE OF ALLEGED PRIOR BAD ACTS THAT SHOWED A PROPENSITY TO COMMIT THE WITHIN OFFENSE WHERE THE EVIDENCE DID NOT SHOW A COMMON SCHEME, WAS NOT RELEVANT TO THE CHARGED OFFENSE, AND THE PREJUDICE GREATLY OUTWEIGHED THE PROBATIVE VALUE.

III. THE PROSECUTOR COMMITTED MISCONDUCT BY CONTINUED INSERTION OF EVIDENCE OF IRRELEVANT, UNCHARGED OTHER ACTS EVIDENCE [WHICH] DENIED DEFENDANT A FAIR TRIAL.

IV. DEFENDANT'S CONVICTIONS MUST BE SET ASIDE WHERE HIS ATTORNEY RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AND THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT ABSENT COUNSEL'S ERRORS. US CONST AM VI, XIV; MICH CONST ART I, SEC 17, 20.

In a *pro per* supplemental brief, petitioner raised three additional claims:

I. DEFENDANT [sic] 6TH & 14TH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED WHERE THE STATE FAILED TO DISCLOSE EVIDENCE OF ANY UNDERSTANDING AND FUTURE AGREEMENTS AS TO THE PROSECUTION OF STATE WITNESS VAUDI HIGGINBOTHAM, WHERE MR. VAUDI HIGGINBOTHAM TESTIFIED FALSELY MISLEADING THE JURY AS TO HIS TESTIMONY OF A PROMISE OF LENIENCY MADE BY THE [PROSECUTOR IN] EXCHANGE FOR HIS TESTIMONY.

II. DEFENDANT [sic] DUE PROCESS RIGHTS UNDER THE 6TH & 14TH AMENDMENTS OF THE U.S. CONSTITUTION WAS VIOLATED WHERE THE PROSECUTOR [sic] TRIAL TACTICS OF VOUCHING FOR JAIL HOUSE SNITCH VAUDI HIGGINBOTHAM, DETROIT POLICE OFFICER KENNETH GARDNER, AMANDA CODDINGTON DEPRIVED THE DEFENDANT OF HIS FUNDAMENTAL RIGHT TO A FAIR TRIAL.

III. DEFENDANT [sic] CONVICTION MUST BE SET ASIDE WHERE HIS ATTORNEY RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL VIOLATING THE DEFENDANT'S 6TH & 14TH AMENDMENT DUE PROCESS RIGHTS, AND, [THERE] IS A REASONABLE PROBABILITY THAT THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT ABSENT COUNSEL'S ERRORS. MICH. CONST. ART 1, SEC 17 & 20.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Varner*, No. 244024, 2006 WL 1867101 (Mich. Ct. App. July 6, 2006) (per curiam).

4.       Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. In addition, petitioner raised two new claims:

I.     RECUSAL/MOTION/NEWLY DISCOVERED EVIDENCE/INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR FAILURE TO ATTACH AFFIDAVITS OF EYEWITNESSES BRIGETTE WOOD/CLARENCE BURNSIDE WHO WOULD EXONERATE CODEFENDANT AND DEFENDANT.

II.    FRAUD UPON THE COURT BY THE TRIAL COURT, WAYNE COUNTY PROSECUTOR, DETROIT POLICE DEPARTMENT BASED SOLELY ON POLYGRAPH, RECUSAL BY BRUCE MORROW, AND ATTEMPT TO KEEP THE EVIDENCE FROM BEING HEARD IN COURT AFTER TRYING TO COVER THE PERSONAL INTEREST IN CASE 01-0893-02.

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Varner*, 477 Mich. 1031, 727 N.W.2d 628 (2007).

5.       Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on March 18, 2008. As grounds for the writ of habeas corpus, he appears to raise eight claims, as set forth in the Table of Contents to his brief:

I.     Did the trial [court] abuse its discretion and commit constitutional error when it denied Mr. Varner's motion for continuance to violate his sixth amendment right to counsel, witness, and to present a defense, and his fourteenth amendment right to due process and a fair trial.

II.    The trial court erred when under 404(B) it allowed evidence of alleged prior bad acts that showed a propensity to commit within offense where the evidence did not show a common scheme, was not relevant to the charge[d] offense, and the prejudice greatly outweighed the probative value. The Court of Appeals applied an unreasonable application to mere 404(B). In this review of the Prejudicial value.

III.    The Prosecutor misconduct by insertion of evidence of irrelevant uncharged

4

other acts evidence denied defendant a fair trial.

IV.     Did the prosecutor violate the dictates of Brady v. Maryland by failing to disclose a plea agreement between the state and the state's late endorse[d] witness by knowingly misleading the defense counsel and the jury through the use of perjured or inaccurate testimony at trial and failure to provide defense with exculpatory evidence [that] might have affected the outcome of the trial.

V.      Petitioner's convictions must be set aside where his attorney rendered constitutionally ineffective assistance of counsel and there is a reasonable probability that the outcome of the trial would have been different absent counsel's errors which were numerous.  U.S. Const. Art. 1, Sec. 17, 20.

VI.     Did the state court appl[y] an unreasonable application of federal law to petitioner violating his sixth amendment right to effective assistance of counsel on the issue of the late endorsed witness.

VII.    Did the state court apply an objectively unreasonable application of federal law in its reasonable opinion on the issue of ineffective assistance of counsel relating to rebuttal witness against prosecution witness, Vaudi Higginbotham.

VIII.   The cumulative effect of the above errors denied Mr. Varner his 14th [Amendment] right to due process.

6.      Respondent filed his answer on September 25, 2008.  Respondent's answer addresses only the four claims set forth in petitioner's form petition.  He contends that these claims are unexhausted, barred by petitioner's procedural default in the state courts, or without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the December 12, 2001, shooting death of Henry Covington.  Petitioner was tried jointly with his codefendant John Poole, whom the prosecution alleged petitioner had hired to shoot Covington.  The evidence adduced at trial was accurately summarized in the brief filed by petitioner's counsel on direct appeal:

Harriet Jones testified that she was the mother of Delora and Kelly Lester and that Henry Covington was Delora's fiancé (T 144-45).  Jones stated that her daughter and Covington lived with her in a two-story flat on Nottingham in the city of Detroit

(T 145).  On December 12, 2001, Covington went outside around 6:45 a.m. to warm up Delora's car (T 145).  Jones heard four gunshots from the driveway and saw Covington fall into the downstairs hallway (T 148).  She did not see anything else and immediately called 911 (T 149).

Jones indicated that Kelly's ex-boyfriend Brian Hallowell had a prior conflict with Covington (T 149-50).  When she was interviewed on December 12, 2001, Jones gave Hallowell's name to the police as an enemy of Covington (T 162).  There was no mention of Mr. Varner in her statement to the police (T 170).  At trial, she testified that Mr. Varner had dated her youngest daughter, Kelly, for over a year, but that the relationship ended in 2001 (T 151-52).  Jones claimed that Delora had purchased a home from Mr. Varner, but that it had been fire bombed on October 9, 2001 (T 153, 156, 158).

Delora Lester testified that on December 12, 2001, she lived with her mother and children on Nottingham (T 177-78).  She moved in with her mother after her house that she had purchased from Mr. Varner was allegedly firebombed (T 179-80, 187).  Delora claimed that there were problems at closing and moving into the house caused by Mr. Varner (T 180, 196).  She alleged that Covington and Mr. Varner exchanged words on the telephone regarding the incident (T 186).

On December 12, 2001, Covington went outside to warm up Delora's car and she heard gunshots (T 188).  She did not see the shooting (T 188).  Delora acknowledged a verbal encounter between Covington and her ex-boyfriend Hallowell (T 193).

Kelly Lester testified that Mr. Varner was her ex-boyfriend and that the two had dated from May 2000 until October 2001 (T 206-7).  She stated that Mr. Varner provided her with cars to drive including a red or burgundy Saturn (T 207-8).  Kelly testified about the house problems that her sister allegedly had with Mr. Varner (T 207-8).  On December 12, 2001, she heard the gunshots but did not see anything (T 211, 213).  Kelly testified that Mr. Varner told her the next day on the telephone that he did not shoot Henry Covington (T 221).  Although she stated that she informed the police about that phone call, it is not in her written statement or any other police statement (T 221).

Fancisco Diaz of the Wayne County Medical Examiner's Office was qualified as an expert in forensic pathology and testified that he performed the autopsy on Henry Covington (T 224-228).  Diaz stated that the cause of death was a gunshot wound and the manner of death was ruled a homicide (T 236).

Michael Choukourian of the Detroit Police Department testified that he was the evidence technician who searched Delora Lester's vehicle that Henry Covington was in when he was shot (T 238-40).  Choukourian recovered a bullet and casing from the car (T 242).

On July 24, 2002, jury trial continued with the testimony of Richard Schwab of the Detroit Police department who indicated that at approximately 7:05 a.m. he was dispatched to the scene with his partner, Officer Toler (T2 11, 18).  Schwab stated that when he arrived he found Covington shot and bleeding (T2 13).  He testified that there were four gunshot holes in the windshield of Delora's Oldsmobile

Alero (T2 14). Schwab helped EMS load Covington into the ambulance and then began talking to neighbors (T2 16). He did not see any shell casings or bullet jackets (T2 16).

Officer Cedric Watkins testified that he was dispatched with his partner, Officer Pellerito, and they arrived just after Officers Schwab and Toler (T2 22). Watkins helped move Covington and then took the statement of Harriet Jones and her boyfriend, Gladeny Johnson (T2 26). Watkins noted that Delora's silver Alero had 4 bullet holes in the windshield, but did not see any shell casings or bullet jackets (T2 28, 30, 34). He acknowledged that Covington was shot while inside the vehicle (T2 30).

Derryck Thomas of the Detroit Police Department Homicide Division testified that he interviewed Cedric Burnside, who gave a physical description of the shooter, and that additional information he received had the police focusing on a red Saturn vehicle with accidental damage to the front end (T2 52-53, 62). The vehicle was eventually found and confiscated (T2 53). Thomas stated that the vehicle was owned by Amanda Coddington (T2 54). There was no investigation or interview with Brian Hallowell (T2 64).

Lieutenant Roy McAllister of the Homicide Division testified that he was the officer in charge of the squad and that Miguel Bruce had previously been the officer in charge (T2 74-76). McAllister stated that Amanda Coddington was interviewed twice on December 18, 2001, and that she gave the police two different statements (T2 76-79). In her first statement of over seven pages, Coddington claimed to be afraid of Mr. Varner, who also was the father of one of her children (T2 82-83, 93).

Amanda Coddington testified that she worked for Mr. Varner managing several properties that he owns (T2 107-8). She indicated that Mr. Varner provided her with a vehicle to drive to the various properties and that in December 2001, she was driving a Saturn (T2 112). Coddington stated that she had a child with Mr. Varner (T2 109).

On December 12, 2001, Coddington alleged that Mr. Varner called her at 5:00 a.m. and requested to meet her at a BP gas station (T2 117). At this point in her testimony, Coddington admitted to perjuring herself at the preliminary examination (T2 119). She then testified that she followed Mr. Varner and they picked up the co-defendant, John Poole, whom Coddington had only met one time (T2 113, 119). They picked up Poole somewhere near I-94 and East Grand Boulevard then drove to Delora Lester's house on Nottingham (T2 122, 125).

Coddington was driving her red Saturn and Mr. Varner was allegedly driving in his white Explorer (T2 123). Coddington stated that Poole was in the vehicle with her and they parked on the next street over from Lester's house (T2 124-26). Poole exited the vehicle and ran down an alley toward Lester's house. Coddington heard shots a few minutes later and Poole then returned to the car (T2 127, 132). At that point, Coddington saw a gun in his hand and Poole put the gun on the floor of the vehicle (T2 129, 132).

Coddington testified that Poole admitted to shooting Henry Covington (T2 133). She then drove Poole home and threw the gun away in a dumpster (T2 138).

Coddington testified that Mr. Varner told her he paid Poole six hundred dollars to shoot Covington (T2 142). Coddington later agreed to the search of her vehicle by police (T2 155).

At trial, Coddington testified that she was afraid of Detroit Police Officer Miguel Bruce who had been the officer in charge of this case (T2 159). She claimed that Bruce repeatedly harassed her and exposed himself to her during the course of the investigation (T2 190-94, 197, 239-50). In an attempt to prove the harassment, Coddington agreed to meet Bruce at a hotel where they had sex (T2 198-200). Unfortunately, the camera or video equipment did not work. Coddington filed a sexual assault claim with the Romulus Police Department and informed the Detroit Police (T2 250-4).

Coddington also testified that her preliminary examination testimony was influenced by Miguel Bruce who sat directly in front of her and suggested her answers to her (T2 218-19). She stated that she had no information about the shooting or any involvement on the part of Mr. Varner or John Poole (T2 251).

Jury trial continued on July 25, 2002. Sergeant Kenneth Gardner testified that he interviewed Mr. Varner at the 7th precinct and later arrested him based on information given to the police from Amanda Coddington (T3 9-12). On December 20, 2001, Gardner claimed that Mr. Varner read and signed his constitutional rights form and agreed to talk to the police (T3 14-17).

Gardner claimed that Mr. Varner told him he knew the person who committed an open homicide case in Detroit involving a man named Alvin Knight and that he knew where the weapon was located (T3 22-23). Gardner alleged that Mr. Varner admitted to hiring the man who shot Knight (T3 24). Gardner stated that Mr. Varner would not put that information into writing until he received a deal on this case (T3 25). Mr. Varner allegedly told Gardner that his nephew, John Poole also known as Tony or "T", had shot Covington after he thought Covington was reaching for a gun (T3 27-28).

LaSalle McCants testified that he was a detention officer for the city of Detroit and that on December 20, 2001, Mr. Varner had requested that he speak with Sergeant Gardner regarding his case (T3 50-1).

Ruby Monts testified that she was a detention officer for the city of Detroit and that on December 18, 2001, Amanda Coddington told her that she wanted to speak with the officer in charge of the case and give him some information because she missed her kids and wanted to be released (T3 112-120).

Officer Michael Carlisle testified that he interviewed Amanda Coddington on December 19, 2001 (T3 57-8). At that time, she had already been interviewed by Lieutenant McAllister (T3 60). Carlisle testified that Coddington was crying and stated that she was scared of Mr. Varner (T3 61). At the end of the interview, Carlisle contacted the Wayne County Prosecutor's Office and had Coddington and her children placed in a local hotel (T3 62).

During the interview, Coddington admitted to throwing the gun in a dumpster near Fenkell and Greenfield (T3 65). Coddington told him that she met Mr. Varner at a gas station and followed him to Poole's home where they picked him up (T3 66).

She told Carlisle that Poole admitted to the shooting when she drove him home (T3 65). Coddington told Carlisle that Mr. Varner admitted to paying Poole for the shooting (T3 67). She signed and initialed her statement (T3 68). Carlisle alleged that she told him she was afraid of Mr. Varner (T3 67).

Detective Gordon Malaniak of the Romulus Police Department testified that on June 24, 2002, he had contact with Amanda Coddington in the emergency room of the Annapolis Hospital (T3 125-26). She filed a rape complaint against Detective Miguel Bruce of the Detroit Police Department (T3 125-126). Malaniak confirmed that Bruce rented a motel room in Romulus and that a search warrant was issued and several items from the room were seized (T3 146).

Vaudia Higginbotham testified that he currently resided in the Wayne County Jail awaiting sentencing (T3 167-68). Higginbotham was charged with First Degree Murder, but pled guilty to Second Degree Murder with a sentencing agreement of 15 to 30 years (T3 68, 76). He claimed that he came in contact with Mr. Varner and that they discussed his case (T3 68). Higginbotham alleged that defendant told him that Miguel Bruce was destroying his life and set him up with his case (T3 69). Higginbotham claimed defendant told him that Coddington was going to stage a fake rape at a hotel in Romulus while his wife took pictures so that they could get back at Bruce (T3 170-71).

Higginbotham further claimed that Mr. Varner told him that he had paid his nephew three hundred dollars to shoot Covington (T3 175). Higginbotham wrote a letter to Sergeant Ernie Wilson after seeing a television report on Miguel Bruce (T3 175, 198). Higginbotham admitted that he hoped to get something for his testimony against Mr. Varner (T3 177).

Marlita Moncreif testified that co-defendant John Poole was her sister's boyfriend and that they had been living with her in December 2001 (T3 204-5). Moncrief gave the Detroit police a written statement in which she indicated that she knew nothing about the shooting (T3 215). During the week of the shooting, Poole had been coming home between 5:00 and 6:00 a.m. and Moncreif remembered that he was with Mr. Varner one day until 7:15 a.m. (T3 215-220).

On July 26, 2002, jury trial continued. Victor Keena testified that he worked at the Romulus Quality Inn on June 24, 2002, and that Miguel Bruce had checked into the hotel and then checked out about one hour later (T4 10-16). Keena provided no other information.

Officer Dale Collins testified that after speaking with Amanda Coddington on December 18, 2001, a search warrant was prepared for Mr. Varner's home in Rochester Hills so that Coddington's children could be retrieved from that location (T4 17-20).

Officer Derryck Thomas was recalled and he testified that he took Marlita Moncreif home after her interview and dropped her off near I-94 and East Grand Boulevard (T4 26-27).

Def.-Appellant's Br. on App., in *People v. Varner*, No. 244024 (Mich. Ct. App.), at 2-9. Neither

petitioner nor Poole testified at trial, and neither presented any evidence in his defense.  Following

closing argument and jury instructions, the jury rendered its verdicts, finding Poole guilty of first

degree murder and firearms offense, and finding petitioner guilty of second degree murder.

      After his trial, and prior to filing his appeal, petitioner filed a motion for new trial in the trial

court, asserting as grounds for relief that his trial counsel rendered constitutionally ineffective

assistance.  The trial court held a two-day evidentiary hearing on the motion.  At the evidentiary

hearing, petitioner first presented the testimony of Arnold Reed, his trial attorney.  Reed testified

that he was retained as replacement counsel prior to trial.  He did not recall whether he told the trial

judge, at the time of the final pretrial conference, that he was not prepared for trial.  *See* Post

Conviction Mot. Hr'g Tr., dated 9/29/04, at 6-7.  He requested an adjournment "[s]o that there could

be more time.  Basically a stalling tactic so that Mr. Varner could come up with a witness that would

support his case."  *Id*. at 8.  Reed indicated that petitioner had given him the names of several

witnesses, and that he investigated those names.  *See id*.  The only potential alibi witness was

petitioner's wife.  However, petitioner did not inform Reed that his wife could support his alibi until

a day or two before trial, and thus no notice of alibi was filed.  *See id*. at 9.  When Higginbotham

became a witness, Reed interviewed him at the jail.  *See id*. at 10.  Reed spoke on several occasions

with Amanda Coddington, and was aware of the allegations concerning a sexual relationship

between Coddington and Officer Bruce.  He did not speak with petitioner's wife about the matter.

*See id*. at 13-15.  On cross-examination, Reed testified that he spoke with petitioner's previous

counsel after being appointed, and obtained from prior counsel the discovery provided by the

prosecution in the case.  *See id*. at 17.  Counsel's strategy was to argue that petitioner was not

involved in the murder, and that the police were out to get him, by pointing to various deficiencies

in the evidence. *See id*. at 17-21. With respect to petitioner's wife, Reed indicated both that her alibi testimony would not have been useful because petitioner was not accused of being at the scene of the shooting, and because she "stated that she was not going to lie and that Mr. Varner was not fixing the tire at the time of the shooting." *Id*. at 24; *see also id*. at 30. Reed contacted another female, Bridgette Woodall, whom he had been told had a relationship with petitioner and could provide petitioner an alibi for the time of the shooting, but she did not support petitioner's alibi. *See id*. at 25, 27-28. He also contacted Selena Booker, who also failed to provide petitioner with an alibi. *See id*. at 28-30. Reed again confirmed that he was ready for trial at the time of the pretrial conference, and that the motion to adjourn he filed was devised to allow petitioner to try to find a witness to support his defense. *See id*. at 26.

Petitioner next testified in support of his motion for new trial. He testified that he was first represented by Mark Brown, with whom he had a rocky relationship. Brown was suspended from the practice of law, and after repeated attempts to contact Brown petitioner hired Mary Johnson as replacement counsel. *See id*. at 32-35. After essentially being without counsel for at least two months, he retained Reed. *See id*. at 37-38. Petitioner testified that, contrary to Reed's testimony, Reed had told his wife that he never received a file from Brown. *See id*. at 38. Further, Reed never investigated anything and lied in his testimony. He denied that he gave any names to Reed for Reed to investigate. *See id*. at 39-41. Reed knew about petitioner's alibi at the time he took over the case. *See id*. at 41-42. After Higginbotham became a witness, Reed did not interview Higginbotham, nor did he interview any other inmates in the jail whom petitioner contends could have testified that he did not make the statements attributed to him by Higginbotham. *See id*. at 43-47. Reed told

petitioner that he did not investigate the crime scene because he did not have time to do so. *See id.* at 48. Petitioner testified that he asked Reed to investigate the victim to establish that he did not have a motive to kill the victim, but that counsel failed to do so. *See id.* at 49-51. He also asked counsel to speak with Kelly Lester, as well as with a female at a bus stop who could have testified differently than the circumstances reflected in the police reports. *See id.* at 51-52. Petitioner asked Reed to interview several detainees at the jail, who could have impeached Higginbotham's testimony. *See id.* at 54-59.

Petitioner also presented the testimony of Mark Brown, his initial attorney. Brown testified that he filed a motion to suppress petitioner's statements to the police. The motion was granted in part, resulting in a reduction of the first degree murder charge to a charge of second degree murder. *See* Post Conviction Mot. Hr'g Tr., dated 10/6/04, at 4-5. He spoke with petitioner regarding the defense, and petitioner told him that he was with his wife at the time of the murder, changing his tire. *See id.* at 6-7. Petitioner's wife indicated that they received assistance from an Oakland County Sheriff's deputy, but Brown did not follow up with the Sheriff's Department. *See id.* at 7. He did not recall telling Reed about this information. *See id.* at 7-8. Although Brown was briefly suspended from the practice of law, it had been served prior to the time he withdrew from the cause. He withdrew because of a breakdown in communication with petitioner. *See id.* at 8. He could not recall the names of any specific witnesses petitioner might have provided to him. *See id.* at 10. Although he and petitioner had discussed calling petitioner's wife as a witness, no final decision had been made at the time he was replaced by Reed. *See id.* at 11.

Finally, petitioner presented the testimony of Rhonda Varner, his wife. She testified that on the morning of the murder, she left their house in Rochester at 6:30 a.m. At the time she left,

petitioner was still at home. She got a flat tire on Rochester road. She called her husband at home. While she was waiting for him, an Oakland County Sheriff's deputy pulled up, but she told him that she did not need assistance because her husband was on the way to help her. When she called home, petitioner answered. He came and helped her change the tire, and they all went home, arriving back home at about 7:15 a.m. *See id*. at 27-33. After they arrived home, petitioner left to go fix a stove in Selena Booker's apartment. He left to do so at about 8:00 a.m. *See id*. at 33-34. She gave this information to both Brown and Reed. *See id*. at 35-36. Reed indicated that he would call her as an alibi witness. *See id*. at 36-37. Petitioner's wife testified that she told Reed about other possible witnesses. She told them about Clarence Burnside, and a man named Benny. To her knowledge, Reed did not contact or interview these witnesses. *See id*. at 40-42.

After hearing argument from counsel, the trial court denied the motion for new trial. With respect to the alibi defense, the court reasoned that because the prosecution did not assert that petitioner was the actual perpetrator or at the scene of the murder, an alibi defense was not "pivotal" and that it appeared that "Mr. Reed's assessment of how the trial was going affected his decision on which witnesses to call, like it does for everybody." *See id*. at 69. With respect to Reed's preparation, the court found that the record supported that Reed was ready for trial, and had only filed a motion for continuance to delay the matter. *See id*. at 71-72. Accordingly, the Court denied the motion for new trial.

C. *Exhaustion/Procedural Default*

Respondent first contends that several of petitioner's claims are either unexhausted or barred by petitioner's procedural default in the state courts. The exhaustion requirement is not jurisdictional. Despite the exhaustion requirement a habeas petition "may be *denied* on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2) (emphasis added). Thus, a federal court may decide a habeas petition on the merits when the grounds for relief are without merit or are not cognizable on habeas review. *See Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991); *Prather v. Rees*, 822 F.2d 1418, 1421-1422 (6th Cir. 1987). In these circumstances, the court should dismiss the non-federal or frivolous claim on its merits to save the state courts the useless review of meritless constitutional claims, *see Cain*, 947 F.2d at 820. Similarly, while the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, while the procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995).

As explained below, petitioner's claims are readily resolved on the merits. For this reason, the Court should proceed directly to the merits rather than resolve the petition on the basis of respondent's exhaustion and procedural default arguments.

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

However, "[i]n order for a federal court to find a state court's application of [Supreme Court]

precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.    *Denial of Continuance (Claim I)*

In his first claim, petitioner contends that he was denied a fair trial and the effective assistance of counsel by the trial court's denial of his request for a continuance after he retained Reed to represent him. Petitioner contends that Reed, who was retained about one month before the trial, did not have adequate time to investigate the case and prepare for trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Although the Supreme Court has not more specifically set forth governing standards to determine when a failure to grant a continuance will constitute a denial of the right to present a meaningful defense, the Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and will be reviewed only for an abuse of that discretion. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940). The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolina*, 218 U.S. 161, 168 (1910). "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). At the same time, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id*. In short, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Unger*, 376 U.S. at 589). Importantly, denial of a continuance amounts to a due process violation warranting habeas relief

17

only where the petitioner shows that he was prejudiced by the omission of the evidence he would have procured had the continuance been granted. *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000); *cf. United States v. Allen*, 247 U.S. 741, 771 (8th Cir. 2001) (applying same standard in case on direct review); *United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (same).

2.    *Analysis*

Here, petitioner cannot show that the trial court abused its discretion by insisting upon expeditiousness in the face of a justifiable request for delay. At the post-trial evidentiary hearing, Reed testified that he was in fact prepared for trial and that his request for an adjournment was "[b]asically a stalling tactic so that Mr. Varner could come up with a witness that would support his case." Post Conviction Mot. Hr'g Tr., dated 10/6/04, at 8; *see also*, *id.* at 26. Further, petitioner does not point to any prejudice resulting from the omission of evidence that he would have procured had a continuance been granted. Petitioner does not identify any witnesses or additional evidence that would have been uncovered by a further investigation. The only missing witnesses petitioner points to that were unknown to counsel at the time the continuance was denied are the jail house witnesses he contends could have impeached Higginbotham. These witnesses, however, were not witnesses at the time the request for a continuance was heard, because petitioner had not yet made his statements to Higginbotham. Thus, the grant of a continuance would have had nothing to do with counsel uncovering these witnesses. Because petitioner can show neither that the judge abused his discretion in denying the continuance nor that he was deprived of any evidence or witnesses by the denial of the continuance, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Other Acts Evidence (Claim II)*

Petitioner next contends that he was denied a fair trial by the introduction of other acts evidence in his case. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas

corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Analysis*

Petitioner contends that he was denied a fair trial by the introduction of evidence relating to a firebombing of a home owned by petitioner, as well as by evidence relating to the murder of Alvin Knight. As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974).

Here, the other acts evidence was relevant for a proper purpose. As explained by the Michigan Court of Appeals, the evidence of the firebombing was offered "to suggest that defendant and the victim had a dispute regarding the Cooley Street house, thus establishing a motive for [petitioner's] arranging the murder at issue here." *Varner*, 2006 WL 1867101, at *2, slip op. at 2.

Evidence of motive is a proper purpose for the introduction of other acts evidence. *See* MICH. R. EVID. 404(b) (evidence of other crimes, wrongs, or acts "may be admissible for other purposes, such as proof of motive . . ."). The evidence relating to the Knight murder was likewise admitted for a proper purpose. Sergeant Gardner testified that petitioner offered to speak about the perpetrator of the Knight murder, whom he had hired, in exchange for leniency. This evidence was admissible for the proper purpose of "show[ing] the voluntariness of [petitioner's] statement." *Varner*, 2006 WL 1867101, at *3, slip op. at 3. Further, the evidence relating to the Knight murder was relevant to rebut petitioner's claim that the police were framing him for the murder at issue in the trial because of their inability to prove his involvement in the Knight murder. *See id.* Because the other acts evidence was relevant for a proper purpose, petitioner cannot show that the introduction of this evidence denied him a fair trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Prosecutorial Misconduct (Claim III)*

In his third claim, petitioner contends that the prosecutor committed misconduct by denigrating his character, vouching for Higginbotham's credibility, and untimely endorsing Higginbotham as a witness.[3] The Court should conclude that petitioner is not entitled to habeas

---

[3]These three claims are raised either in petitioner's form petition or in the brief attached to his petition. In the state courts, petitioner raised several other prosecutorial misconduct claims. These additional claims are neither stated nor argued in his petition and brief, and thus they do not appear to be raised here. Notably, to the extent petitioner claims that the prosecutor committed misconduct by introducing and commenting on the other acts evidence, the claim is without merit. Because the state courts concluded that this evidence was admissible, the prosecutor did not commit misconduct by introducing the evidence or commenting on it during argument. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.). As the Sixth Circuit recently explained, "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008).

relief on these claims.

    1.       *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

    2.       *Analysis*

        *a. Denigrating Petitioner*

Petitioner first contends that the prosecutor repeatedly denigrated him during closing and rebuttal argument by commenting, numerous times, that bad things happen to people who cross petitioner. *See* Trial Tr., Vol. V, at 52-54, 56, 72, 122. In context, however, the prosecutor's comments were not improper. The prosecutor relied on the evidence in the case, particularly the firebombing of the house and petitioner's attempt to implicate Poole in exchange for leniency, to

argue that the jury should consider the fact that bad things happen to people who cross petitioner when evaluating the testimony. Specifically, the prosecutor argued that these facts explained Coddington's inconsistent and hesitant testimony, and provided support for the officer's testimony regarding petitioner's statement to the police. *See id.* at 54-56, 72. Because the prosecutor's argument was based on the facts of the case, they did not deprive petitioner of a fair trial. *See United States ex rel. Williams v. Washington*, 913 F. Supp. 1156, 1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied" did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable inferences drawn from the physical evidence and witness testimony[.]"). Further, even if improper the comments were not so egregious as to deny petitioner a fair trial. *See Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair trial where prosecutor referred to him as a "murderer" and "artful liar"). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### *b. Vouching*

Petitioner also contends that the prosecutor improperly vouched for the credibility of Higginbotham. During rebuttal, the prosecutor responded to defense counsel's assertion that Higginbotham was lying about petitioner's statements to him concerning the play to set up Miguel Bruce for rape and had gotten the information about the plan from a television news story or from papers petitioner was showing to other detainees. The prosecutor argued:

> Now, if the names weren't named on t.v. how does Mr. Higginbotham know it's Miguel Bruce and Amanda, but for the information from Mr. Varner? That's the way he knows. Because the initial story three weeks ago didn't name those names.
> * * * *
> The only way Vaudia would know the information he knew is because it came from Mr. Varner. It's consistent with what Mr. Varner tried to do when he talked to Kenneth Gardner. And it's not inconsistent with the limited physical evidence available.

Trial Tr., Vol. V, at 120, 122. These comments did not amount to improper vouching.

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[4] Here, the prosecutor neither implied that she had special facts not in front of the jury nor suggested a personal belief in the witnesses' credibility. Rather, the prosecutor was arguing that neither the television news reports nor the papers allegedly seen by Higginbotham provided the detail necessary for Higginbotham to have learned the details of the plan to set up Miguel Bruce for rape, and thus common sense dictated that the information had to have come from petitioner. The prosecutor's argument was thus based on the evidence presented at trial. This was not improper vouching. *See United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998) ("[W]here a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness is based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching."); *see also*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence). Accordingly, the Court should conclude that petitioner is not entitled

---

[4]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

to habeas relief on this claim.

### c. Late Endorsement

Petitioner next contends that he was denied a fair trial by the prosecutor's late endorsement of Higginbotham as a witness. This claim is without merit. As another Judge of this Court has explained,

> the state's failure to endorse a witness prior to calling that witness to testify does not violate any federal constitutional right and is not grounds for federal habeas relief. *Mitchell v. Wyrick*, 698 F.2d 940, 943 (8th Cir.1983); *Drews v. State of Minnesota*, 407 F.2d 1307, 1309 (8th Cir.1969); *Winkler v. Solem*, 525 F. Supp. 117, 120 (D.S.D.1981), *aff'd* 688 F.2d 594 (8th Cir.1982). It is not a fundamental error to permit a prosecutor to endorse a witness in the course of a trial even though the prosecutor had previously filed an affidavit that such witness did not have material evidence to offer. *Whalen v. Johnson*, 438 F. Supp. 1198 (E.D. Mich. 1977).

*Hence v. Smith*, 37 F. Supp. 2d 970, 982 (E. D. Mich.1999) (Gadola, J.); *see also*, *Fike v. Trombley*, No. 2:07-CV-10868, 2010 WL 1286412, at *14 (E.D. Mich. Mar. 31, 2010) (Zatkoff, J.). "There is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and thus the presentation of a "surprise" witness does not violate a defendant's due process rights. *See id*. at 560-61. Moreover, here the late endorsement of Higginbotham did not even violate state law. Because Higginbotham was not known to the prosecutor prior to trial, there was good cause for the late endorsement of Higginbotham as a matter of state law. *See People v. Burwick*, 450 Mich. 281, 289, 537 N.W.2d 813, 816-17 (1995). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.     *Suppression of Exculpatory Evidence (Claim IV)*

Petitioner next contends that the prosecution suppressed exculpatory evidence in the form of a deal given to Higginbotham in exchange for his testimony. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

In *Napue v. Illinois*, 360 U.S. 264, 268-69 (1959) and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), the Supreme Court held that a defendant's right to a fair trial under the Fourteenth Amendment may be violated where the prosecution deliberately misleads a jury, or allows misleading testimony to go uncorrected, with respect to any promises offered a key prosecution witness in exchange for his testimony.  A *Napue/Giglio* violation is a subset of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Court held that "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.

In analyzing a *Brady* claim, a court must ask three questions:  (1) Was evidence "suppressed" by the prosecution in that it was not known to petitioner and not available from another source?; (2) Was the evidence exculpatory?; and (3) Was the evidence material to the question of petitioner's guilt?  *See Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  Similarly, therefore, in order to establish a *Napue/Giglio* violation, petitioner must show (1) that there was a promise of aid or leniency by the prosecution, (2) which was undisclosed to the jury, and (3) which may have affected the jury's verdict.  *See Zeigler v. Callahan*, 659 F.2d 254, 263 (1st Cir. 1981), *cited with approval in Nunn v. Yukins*, No. 98-2309, 2000 WL 145378, at *2 (6th Cir. Feb. 4, 2000); *see also*, *Routly v. Singletary*, 33 F.3d 1279, 1286 (11th Cir. 1994).

2.      *Analysis*

At trial, Higginbotham testified that he had pleaded guilty to second degree murder.  The

plea came about as a result of an agreement with the prosecutor in which he promised to testify against his co-defendant in exchange for reduction of the charge from first degree murder and a sentence of 15-30 years' imprisonment. *See* Trial Tr., Vol. IV, at 168, 175-76. He did not receive any promises or agreements of leniency in exchange for his testimony against petitioner, but he hoped that he would receive some benefit. *See id.* at 176. Petitioner contends that, in fact, Higginbotham was given a deal in exchange for his testimony against petitioner in this case. However, petitioner has provided nothing to substantiate this allegation. Petitioner attaches to his brief numerous affidavits of other inmates, some of whom aver that Higginbotham claimed to have received a deal in exchange for his testimony. These affidavits, however, do not attest to any personal knowledge of a deal, and do not even assert that Higginbotham claimed to have gotten a deal in exchange for his testimony against petitioner. The most that the affidavits establish is that Higginbotham received a deal in exchange for his testimony against his co-defendant in his own case, and that Higginbotham hoped that he would receive some additional benefit by testifying against petitioner. Because there is no evidence that Higginbotham was given a deal in exchange for his testimony, petitioner cannot establish a *Giglio* violation. *See Abdur-Rasheed v. Jones*, 100 Fed. Appx. 357, 359 (6th Cir. 2004); *United States v. Elkins*, 885 F.2d 775, 788 (11th Cir. 1989); *Leonard v. Warren*, No. 03-CV-71430, 2005 WL 1349115, at *4 (E.D. Mich. Jan. 31, 2005) (Komives, M.J.), *report adopted*, 2005 WL 2072108 (E.D. Mich. Aug. 25, 2005) (Roberts, J.).

Moreover, even if an implicit deal existed and was not disclosed, petitioner cannot show that the suppressed deal was material. Higginbotham testified that he hoped to receive leniency in exchange for his testimony, and this hope alone had significant impeachment value regardlesss of the existence of an actual deal. Higginbotham was cross-examined extensively by both petitioner's

and co-defendant Poole's counsel about what he hoped to receive in exchange for his testimony and about the benefits he already received by testifying against his own codefendant, *see* Trial Tr., Vol. IV, 187-91, as well as about other ways Higginbotham could have known about the plan to set up Miguel Bruce for rape, including by looking at petitioner's legal papers, *see id*. at 193-95, 199-200, and by watching television news reports, *see id*. at 198-99. In light of this significant impeachment evidence, it is not reasonably probable that the existence of an actual deal, if one in fact existed, would have altered the jury's assessment of Higginbotham's credibility. *See United States v. Avellino*, 136 F.3d 249, 257 (2d Cir.1998) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material."); *McKleskey v. Kemp*, 753 F.2d 877, 884-85 (11th Cir. 1985) (en banc) (no reasonable likelihood that undisclosed statement of government agent promising leniency would have affected the jury's assessment of witness's credibility where witness admitted to a number of previous convictions and admitted that he was testifying to protect himself from a codefendant), *aff'd on other grounds*, 481 U.S. 279 (1987); *Moore v. Zant*, 682 F. Supp. 549, 551 (M.D. Ga. 1988). In short, Higginbotham's "background, character, potential motive for lying, and hope that he would obtain additional benefits in the future were all disclosed to the jury. The addition of one more inducement or promise of leniency relating to his convictions would not have given the jury a different picture of [Vaudia Higginbotham]. Therefore, the prosecution's failure to disclosed the alleged agreement would not, with reasonable probability, have changed the result of the underlying proceeding." *Williams v. Calderon*, 48 F. Supp. 2d 979, 1003 (C.D. Cal. 1998). Accordingly, the Court should conclude that petitioner is not entitled to relief on

this ground.

I.      *Ineffective Assistance of Counsel (Claims V-VII)*

Petitioner next claims that his trial counsel was constitutionally deficient in several respects. As best as can be gleaned from petitioner's brief, he contends that trial counsel was ineffective for failing to: (1) investigate the case; (2) procure transcripts of the pretrial hearing on the voluntariness of petitioner's statements to the police; (3) call Clarence Burnside as a witness and call other alibi witnesses; (4) object to the late endorsement of Higginbotham, seek a continuance after Higginbotham testified, and present witnesses to rebut Higginbotham's testimony; and (5) object to prosecutorial misconduct. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that

counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2. *Analysis*

a. *Failure to Investigate/Obtain Transcripts*

Petitioner contends that trial counsel was ineffective for failing to investigate the case and failing to obtain transcripts of the pre-trial hearing on the voluntariness of his confession which could have been used to impeach the prosecution witnesses. The Court should conclude that petitioner is not entitled to habeas relief on these ineffective assistance claims.

With the exception of the specific witnesses discussed below in petitioner's other ineffective assistance claims, petitioner does not in his more general failure to investigate claim identify with specificity any witnesses counsel should have interviewed, any avenues of investigation counsel should have pursued, or any specific motions that counsel should have filed. Petitioner's conclusory allegations are insufficient to establish that counsel was ineffective. *See Dell v. Straub*, 194 F. Supp. 2d 629, 650 (E.D. Mich. 2002) (Friedman, J.); *Matura v. United States*, 875 F. Supp. 235, 237-38 (S.D.N.Y. 1995). He likewise does not suggest any additional exculpatory evidence or theories that

would have been uncovered by further investigation or preparation. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it could have affected the outcome of the trial."). Thus, petitioner's generic failure to investigate claim is without merit.

With respect to the transcript issue, to be entitled to relief on this claim petitioner must also establish that counsel's failure to obtain the transcripts resulted in prejudice. *See Robinson v. Jabe*, No. 91-1289, 1992 WL 27017, at *6 (6th Cir. Feb. 13, 1992); *Blackburn v. Foltz*, 828 F.2d 1177, 1184 (6th Cir. 1987). That is, petitioner must show that counsel's obtaining the transcript would have given counsel impeachment information, and that there is a reasonable probability that, had counsel used this impeachment information, the result of the proceeding would have been different. Here, petitioner makes a blanket assertion that the pre-trial hearing transcript could have been used to impeach the prosecution witnesses' trial testimony. He does not however, identify any specific avenues of impeachment that could have been developed through the use of the pre-trial hearing transcript. His failure to identify with specificity the impeachment material the transcript could have provided is fatal to his claim. *See Urban v. Berghuis*, No. 2:07-CV-15092, 2009 WL 5743216, at *19 n.8 (E.D. Mich. Dec. 4, 2009) (Komives, M.J.), *report adopted*, 2010 WL 420005 (E.D. Mich. Jan. 28, 2010) (Cohn, J.) ("[I]t is petitioner's burden to identify the specific deficiencies of counsel and how those deficiencies prejudiced him. It is not the job of this Court on habeas review to search the transcripts of two trials to identify possible avenues of impeachment that counsel might have been able to develop in the second trial."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

*b. Failure to Call Burnside/Alibi Witnesses*

Petitioner also argues that counsel was ineffective for failing to call Charles Burnside as a witness, and for failing to call alibi witnesses at trial. Generally, "[c]omplaints of uncalled witnesses are not favored in federal habeas review." *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Aponte v. Scully*, 740 F. Supp. 153, 158 (E.D.N.Y. 1990). As one court has explained:

> The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. [Defendant] does not identify any witnesses that his counsel should have called who would have been helpful. Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation. Decisions whether to engage in cross examination, and if so to what extent and in what manner, are similarly strategic in nature.

*United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *accord Reese v. Fulcomer*, 946 F.2d 247, 257 (3d Cir. 1991) (counsel's performance not deficient where counsel did not call alibi witness whose testimony could have been damaging); *United States v. Porter*, 924 F.2d 395, 397 (1st Cir. 1991) (decision not to call witnesses who could have incriminated defendant within scope of informed professional judgment). Further, it is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). Thus, "a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits." *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5 (N.D. Ill. Aug. 8, 2001) (citing *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also*, *Pittman v. Florida*, No. 8:05-cv-1700, 2008 WL 2414027, at *12 (M.D. Fla. June 11, 2008).

Here, petitioner has failed to meet his burden of demonstrating that counsel was ineffective.

Apart from the testimony of his wife at the state court evidentiary hearing and her affidavit here, petitioner has presented no evidence, such as an affidavit, that the witnesses he claims counsel should have presented would, in fact, have testified on his behalf, nor any information regarding the substance of their purported testimony. Moreover, at the evidentiary hearing Reed, whose testimony was credited by the trial court, testified that he contacted Bridgette Woodall and Selena Booker at petitioner's request, but neither supported petitioner's alibi. *See* Post-Conviction Mot. Hr'g Tr., dated 9/29/04, at 25, 27-28, 28-30. With respect to Burnside, Reed testified that he attempted to locate Burnside, but was unable to do so. *See id*. at 22. Further, Reed made a tactical decision that Burnside's testimony could have hurt as much as help petitioner's case, because Burnside would have put Amanda Coddington's car at the scene of the murder. *See id*. at 22-23. These facts, testified to at the evidentiary hearing and accepted by the trial court, have not been rebutted by any "clear and convincing" evidence and are presumed correct. *See* 28 U.S.C. § 2254(e).

With respect to petitioner's wife, Reed testified at the evidentiary hearing that she did not, in fact, support petitioner's claim that he was changing her tire at the time of the murder. *See* Post-Conviction Mot. Hr'g Tr., dated 9/29/04, at 24, 30. To be sure, petitioner's wife gave conflicting testimony, but in rejecting petitioner's motion for new trial the trial court credited Reed's testimony over that of petitioner's wife, and petitioner has presented no clear and convincing evidence to rebut this credibility determination. And, in any event, neither the testimony of petitioner's wife nor any other alibi witness would have affected the result of the trial. The prosecution did not argue that petitioner was directly involved in the actual shooting of Covington. Rather, the prosecution's theory was that Poole killed Covington at petitioner's request. Thus, under the evidence and the prosecution's theory, petitioner's presence at the scene was irrelevant, and an alibi would not have

provided a defense to the charges. Thus, petitioner cannot show that he was prejudiced by counsel's failure to present his wife or other alibi witnesses. *See United States v. Dungy*, No. CR01-3038, 2009 WL 230693, at *7 (N.D. Iowa Feb. 2, 2009) (defendant not prejudiced by counsel's failure to present alibi defense, where alibi would not have provided defense to drug conspiracy charge because charge did not require defendant's presence at any particular place or time); *Telguz v. Warden of Sussex I State Prison*, 688 S.E.2d 865, 869 (Va. 2010) (defendant not prejudiced by counsel's failure to call alibi witnesses where defendant was accused of hiring killer and there was no contention that defendant participated in the actual killing); *cf.* CJS *Criminal Law* § 121 ("An alibi is unavailing where the prosecution's theory is that the accused acted through an agent."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Handling of Higginbotham Testimony

Petitioner next contends that counsel erred in the handling of Higginbotham's testimony in two respects. First, petitioner argues that counsel was ineffective for failing to object to the presentation of Higginbotham's testimony on the basis that the prosecution failed to timely disclose Higginbotham as a witness. Second, petitioner argues that counsel was ineffective for failing to request a continuance after Higginbotham testified to secure detainees at the jail who could have rebutted Higginbotham's testimony. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

Petitioner cannot show a reasonable probability that, had counsel objected to Higginbotham's testimony, the objection would have been sustained. Under the Michigan witness statute, the prosecution must disclose to the defendant the names of all known witnesses, and is under a continuing duty to supplement the disclosure as the identities of additional witnesses becomes

known.  *See* MICH. COMP. LAWS § 767.40a(1), (2).  The statute further provides that, no less than 30 days prior to trial, the prosecutor must provide to the defendant a list of all witnesses that the prosecutor intends to call at trial.  *See id.* § 767.40a(3).  However, the statute also provides that "[t]he prosecuting attorney may add or delete from the list of witnesses he or she intends to call at trial at any time upon leave of the court and for good cause shown or by stipulation of the parties."  *Id.* § 767.40(4).  As the Michigan Supreme Court has explained, "[t]he advance notice required by the statute is advance notice of witnesses *known* to the prosecution."  *People v. Burwick*, 450 Mich. 281, 291, 537 N.W.2d 813, 817 (1995).  Here, there is no question that Higginbotham was not known to the prosecution until the time of trial.  Because of this, there was good cause to allow the prosecution to amend its witness list and present Higginbotham as a witness.  *See id.* at 289, 294, 537 N.W.2d at 817, 818-19.  Thus, petitioner cannot show that he was prejudiced by counsel's failure to object to Higginbotham on the basis of the prosecutor's failure to list him as a witness.

Nor can petitioner show that counsel was ineffective for failing to seek a continuance and produce at trial other detainees at the jail who could rebut Higginbotham's testimony.  The affidavits attached by petitioner to his brief do not rebut Higginbotham's testimony.  They do not claim to have observed Higginbotham at all times, rending a conversation between Higginbotham and petitioner impossible.  Rather, these witnesses merely aver that petitioner disliked Higginbotham, and thus would not have talked to him.  The fact that these witnesses did not observe a conversation between Higginbotham and petitioner does not preclude the possibility that such a conversation happened.  Nor does the fact that petitioner never discussed his case with these witnesses.  Because these witnesses could not testify that petitioner did not in fact speak with Higginbotham about his case, their testimony at best would have been only marginally probative.

Thus, petitioner cannot show that he was prejudiced by counsel's failure to request a continuance and present these inmates as witnesses. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Failure to Object to Prosecutorial Misconduct

Finally, petitioner contends that counsel was ineffective for failing to object to the prosecutorial misconduct at his trial. As explained above, however, petitioner's prosecutorial misconduct claims are without merit, and thus any objection by counsel would have been meritless. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993); *White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### J.    *Cumulative Error (Claim VIII)*

Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the errors at his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due

process.  *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994).  As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

K.      *Recommendation Regarding Certificate of Appealability*

        1.      *Legal Standard*

        As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999)

(quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability, for the reasons explained above. Because counsel conceded at the evidentiary hearing that the request for a continuance was merely a stalling tactic, and because petitioner has failed to identify any witnesses or evidence he was unable to present as a result of the denial of his continuance, the court's resolution of petitioner's

continuance claim is not reasonably debatable. Similarly, given the relevance of the other acts evidence at petitioner's trial and the uniform body of law that the presentation of other acts evidence does not deprive a defendant of a fair trial, the resolution of petitioner's other acts evidence claim is not reasonably debatable. With respect to petitioner's *Giglio* claim, there is no evidence that Higginbotham in fact received any promises of leniency from the prosecution, and in any event he was significantly impeached as to both the plausibility of his testimony and his motive for testifying. Thus, the resolution of this claim is not reasonably debatable. Finally, for the reasons explained in connection with the merits of those claims, the resolution of petitioner's prosecutorial misconduct and ineffective assistance of counsel claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

L.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.     <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of

objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:5/6/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on May 6, 2010.

s/Eddrey Butts
Case Manager